THE REGENTS OF THE UNIVERSITY OF THE STATE OF MINNESOTA, impleaded with others, Appellants, vs. ALEXANDER HART, et al., Respondents.

## APPEAL FROM THE DISTRICT COURT OF HENNEPIN COUNTY.

The Regents of the University are a public corporation, for the purpose, among other things, of erecting a university building, and for that purpose, with the restrictions hereafter mentioned, possess all the powers necessary to the attainment of that end. They could make all necessary contracts, and give written evidences to creditors of debts incurred in and about the work, payable at a future day, but could not execute a negotiable promissory note, in the commercial sense of that term, because they were restricted in their expenditures to the particular fund provided for them by the Legislature, and had no power to contract debts upon the credit of any other, and negotiable paper must be payable absolutely.

All persons dealing with them, are chargeable with knowledge of the extent of their powers.

An action may be maintained against them upon any contract which they had power to enter into, concerning the erection of the University buildings, but a judgment recovered upon such contract would bind only the fund upon the faith of which the credit was originally given.

The title of the land reserved by Congress for the use and support of a State University, is in the State, and not in the corporation, and all property acquired by the Regents, with the funds placed at their disposal, is the property of the State, the corporation being merely a trustee or agent, with specified powers to use it in a particular manner for a given end.

## Points and Authorities for Appellants.

I.—Corporate powers are confined to those specifically granted, and by implication to such others as may be necessary for the exercise and enjoyment of those conferred. 2 *Kent's Com. 7th Ed. p.* 344, *cited and approved by this court in School District against Thompson,* 5 *Minn.* 280; *Edwards on Notes, p.* 348; *Angel & Ames on Cor., Sec.* 271, 256; *Salem Mill-dam Co. vs. Ropes,* 6 *Pick.,* 32; *Berlin vs. New Britain,* 9th *Conn.,* 180; *N. Y. Fireman's Insurance Co., vs. Ely,* 5 *Conn.* 572.

*a.* Although in general an express authority to issue negotiable paper is not requisite, yet in the case at bar, such power is not only not necessary or incidental to the execution of the powers expressly conferred, but is obviously foreign to the purposes of the charter. *Angel & Ames on Cor., Sec.* 257; *School District vs. Thompson,* 5 *Minn.* 280; *Sec.* 2, 13, 15, *Ch.* 23, *p.* 350, *Comp. Stat.*

vol vii.—9

II.—When the mode of executing the powers specifically granted is expressly prescribed, nothing can be taken by intendment, and no other mode can be adopted. The maxims, "*Expressio unius est exclusio alterius,*" and "*Expressum facit cessare tacitum,*" furnish the true rule of construction. *School Dist. vs. Thomp.,* cited ante; *Angel & Ames on Cor.,* Sec. 111; *N. Y. Fireman's Ins. Co. vs. Ely,* 2 *Cowen* 699; *Heard vs. Providence Ins. Co.,* 2 *Cranch* 127; *Bank of Augusta vs. Earle,* 13 *Peters* 519; *The Farmer's Loan & Trust Co. vs. Carroll,* 5 *Barb.* 649.

*a.* The act of contracting any indebtedness for the erection of a University building, was *ultra vires* and void—another mode had been expressly prescribed, and the work of erecting and organizing the University was to proceed "*pari passu,*" with the procurement of funds, and not otherwise; because—

1st. The Regents *might procure a suitable site* as soon as they deemed expedient, but should not proceed to the erection of a building *until funds were provided for that purpose. Sec.* 13, *p.* 350 *Comp. Stat.*

2nd. The Regents were authorized to expend *such portion of the fund which, by the provisions of this chapter, may come under their control,* for the erection of suitable buildings as they may deem expedient. *Sec.* 15.

3rd. The only fund which, by the provisions of that chapter, would come under their control, was the interest on the perpetual fund to be derived from the proceeds of the lands granted by the United States. *Sec.* 2.

Where a definite and specific fund is provided or referred to in the charter, and the evident intention is to confine the operations of the corporation to the fund thus created or recognized, the contracting of an indebtedness for the accomplishment of the same purpose is illegal and void. *Barmester vs. Norris,* 8 *Eng., L. and Eq.,* 487, 490, 491; *McCulloch vs. Moss,* 5 *Denio,* 567, 579.

III.—The Plaintiffs will not claim that they received the notes in suit without notice of the purpose for which they issued, as they expressly set up the consideration in the complaint, and the resolution which they rely upon as conferring

authority upon the agents who executed such paper expressly referred to it.

Should this be pretended, however, we answer :

1st, The Regents had no power to execute negotiable paper for any purpose, and of course parties dealing with a corporation must take notice of its corporate powers. *Angel & Ames on Cor.*, *Sec.* 299.

2nd, They certainly had no power to contract indebtedness for the erection of buildings, and if any power to execute negotiable paper existed, it being a conditional implied power only, the rules applicable to banks and corporations having general power to issue such paper, are not applicable, and the holder takes it at his peril. *Halstead vs. Mayor &c. of New York*, 5 *Barb*, 218.

It may be also remarked that the charter of the Regents is a public act, of which all are bound to take notice. If not, the case of the Plaintiff fails, and the motion to dismiss should have been granted, as the Plaintiffs, acting upon that theory, neglected to introduce it in evidence on the trial.

A note, however, issued in contravention of the charter, is void, *ab initio*, and of course in the hands of innocent parties. *Angel & Ames on Cor.*, *Sec.* 256.

IV.—It may be said that it does not appear that funds were not provided.

This would not affect the question. Such construction would be an absurdity. The object of the charter was to prohibit any indebtedness, and to provide a specific fund which should *be applied* to the purposes of the University. *Sec.* 15, *p.* 351, *Comp. Stat.*

But if such construction were admissible, the *onus probandi* is on the Plaintiff to show that the indebtedness was such as the Regents were authorized to contract. *School District vs. Thompson*, 5 *Minn.*, 280.

V.—The Plaintiffs will refer the Court to the acts of February 21st, 1856, and March 8th 1858, and insist that by these acts a fund *was* provided, and that especially by the first of said acts, the sum of ten thousand dollars was to be expended in the erection of suitable buildings.

To this we answer that it does not appear that one dollar

64 . CASES IN THE SUPREME COURT,

Regents of the University of the State of Minnesota v. Hart et al.

was realized from the sale of the bonds; but if the contrary appeared, these acts are an express legislative recognition of the construction for which we contend, viz: that the Regents had no authority, under the original charter, to contract indebtedness for this purpose, in the absence of express legislation; and so far from extending or enlarging their power in that regard, provide an additional mode of erecting the buildings, which is also to the exclusion of any other. The Regents are authorized to expend ten thousand dollars only, and the manner in which that sum is to be procured is explicitly prescribed.

VI.—Mr. Steele, in signing the notes in suit, exceeded the scope of any real or apparent authority vested in him. The resolution of the Regents authorized the *President* to execute these notes. The chancellor was *ex officio* President of the Board, and this would have been ascertained by the Plaintiffs by an examination of the act of incorporation.

The language of the statute, authorizing the appointment of a President *pro tem.*, when the regular President is absent, applies only to the election of an officer to preside over the meetings of the Board. It does not appear that the chancellor was absent from the State, or from his residence in Saint Paul. There was no vacancy in his office. A different construction would present the anomaly of two Presidents, acting, and having the right to act, at the same time. *Sec. 9, p. 351, Comp. Stat.*

If it be said that the Regents, by the acceptance and use of the property, have ratified the unauthorized act of their agents, we reply that the Regents, having no power to execute promissory notes, or to contract indebtedness for *this purpose*, could not ratify it. *Hodges vs. City of Buffalo*, 2 *Denio*, 110.

Points and Authorities for Respondents.

We propose first to discuss the case as though the notes were sued by the payees, waiving for the present the questions growing out of the negotiation of the same, and the rights acquired thereby by the Plaintiffs.

I.—The Regents had the power to make a negotiable promissory note for a debt contracted within the scope of their legitimate business. *2d Vol. Kent's Com.*, p. 278, *note a*; *Att'y General vs. Life & Fire Ins. Co.*, 9 *Paige Ch.*, 470; *Moss vs. Oakley*, 2 *Hill*, 265; *Kelly vs. The Mayor, &c., of Brooklyn*, 4 *Hill*, 263; *Barker vs. Mechanic Fire Ins. Co. of N. Y.*, 3 *Wend.*, 94; *Angell & Ames on Cor.*, secs. 257-58; *Barry vs. Merchants' Exchange Co.*, 1 *Sandf. Ch.*, 280.

The charter confers upon the corporation general powers of " suing and being sued, contracting and being contracted with," and there is nothing in it which either expressly or by implication prohibits them from issuing notes for a debt incurred within the scope of their legitimate business.

The pleadings and evidence show conclusively that these notes were given for one of the special objects for which the corporation was created.

II.—The presumption of law is, that the notes were made for a lawful purpose, and that the Regents had authority to issue them. See *Form of complaint on Prom. Notes vs. a Corporation, in Abbott's Pleadings*, p. 127; *Mutual Benefit Life Ins. Co. vs. Davis*, 2 *Ker.*, 569; *Barker vs. Mechanic Fire Ins. Co. of N. Y.*, 3 *Wend.*, 94; *Safford vs. Wycoff*, 4 *Hill*, 442; *Ex parte Peru Iron Co.*, 7 *Cow.*, 539; *Angell & Ames on Cor.*, sec. 267; *Dana & White vs. Bank of St. Paul*, 4 *Minn.*, 385; *McIntire vs. Preston*, 5 *Gilman*, (*Ill.*) 48.

III.—It follows from the above that if the Regents intend to rely as a defence upon these notes being issued without authority of law, they must set forth the facts showing such want of authority in their answer, and prove the same on the trial, which they have not done. See in addition to the cases before cited, *New York Floating Derrick Co. vs. New Jersey Oil Co.*, 3 *Duer*, 648; *Army Ensign vs. Richard H. Sherman*, 13 *How. Pr.*, 35.

The complaint alleges that the notes were given for constructing a University building, and that the corporation had full power to contract the indebtedness and give the notes therefor, a conclusion the law would have raised if it had not been stated.

The Regents say in their answer that they had no power to contract the indebtedness or give the notes, and exceeded their authority in so doing—which is merely a conclusion of law. There were no facts stated to show that they exceeded their authority, nor were there any proved on the trial.

The Regents argue that they had no power to contract the indebtedness for which the notes were given, because funds had not been provided for that purpose in the manner pointed out by the charter, yet it does not appear from the pleadings or evidence but that they had sufficient funds; and if the Regents relied upon that defence, it was incumbent on them to show it. The Court will not presume that they violated their charter. *See cases before cited.*

The presumption is that they had funds provided for the purpose, and if so it could not be with reason contended that they were under all circumstances obliged to apply the funds to the payment of a debt the moment it accrued. If they were authorized to contract a debt, and had funds as a basis for the contract, that would certainly be sufficient. And if the debt was properly contracted, they could agree upon a future time for payment, as the convenience of the parties might dictate, and evidence the debt in the meantime by a promissory note. The construction contended for by the Attorney General is unreasonable, and would compel the Regents to pay every liability the moment it became due; and if this was not done, the debt legally contracted would, by being allowed to stand, become illegal—the injustice and absurdity of which result is very obvious.

IV.—It appears affirmatively that a fund had been provided for the erection of these buildings. See *Pub. Stats., p.* 352, *sec.* (21); *ib., p.* 353, *sec.* (26).

The act of February 21, 1856, expressly authorized the Regents to borrow $10.000, on bond and mortgage, to be expended in the erection of University buildings. The notes sued on in this case amount to only $1809.59.

By the act of March 8, 1858, they are authorized to borrow $40.000 on bond and mortgage,—and this was after the contract to build the University buildings was made, which was in 1856, and about the time they were completed, as appears by the testimony. See *case, fol.* 63..

Section 13 of the charter authorizes the Regents to proceed to the erection of a building "as soon as funds may be provided for that purpose,"—not as claimed by the Attorney General—as soon as funds arise from the sale of lands, but generally as soon as funds may be provided, and the acts above cited place under their control a fund of $50.000.

These acts show not only that the Legislature authorized the Regents to erect these buildings, but that it ratified their action in the matter.

V.—If funds had not been provided, it is insisted with entire confidence that it would constitute no defence to the notes. *Authorities cited below.*

It appears conclusively from the evidence that the Regents received full value for these notes, which they accepted, and now possess and enjoy; and it does not lie in their mouth to say to an innocent party that their act of incurring the obligation was unauthorized, and that therefore they will repudiate the same.

It is not every act of a corporation that is unauthorized or *ultra vires*, the obligation arising from which can be defended against on that ground.

The charter authorizes the Regents to build University buildings when they have funds for that purpose. It is impossible for a party dealing with them to know whether they have funds or not. The charter does not inform him. That is a matter peculiarly within the knowledge of the corporation; and by making the contract they impliedly represent that they have funds for the purpose, and are estopped by every principle of justice and equity from denying it.

A party dealing with a corporation is bound to know of its powers only what is to be learned from its charter, and where the want of power arises out of extrinsic facts peculiarly within the knowledge of the corporation, it cannot avail itself of that illegality to repudiate its obligations.

The rule on this subject (or perhaps more properly the exception to the general rule) is well stated by Selden, J., in the late case of *Russell vs. The Mich. South. & North. Ind. R. R. Cos.*, 22 *N. Y.*, 290.

Whether by reason of such an unauthorized act the State

might not seize the franchises of the corporation, and wind it up, is entirely a different question.

The Attorney General has argued this case just as though it was an information in the nature of a *quo warranto* brought by the State against the corporation. But the principles applicable to such proceedings do not apply to this case. The question here is whether a private individual shall suffer by an unauthorized act which he is not presumed to know and had no means of knowing was unauthorized.

The following authorities are cited to this point, some of which go further than is necessary for our case : *Moss vs. The Rossie Lead Mining Co.*, 5 *Hill.*, 137; *Little vs. O'Brien*, 9 *Mass.*, 422; *The Epis. Char. So. vs. Epis. Ch. in Dedham*, 1 *Pickering*, 371; *Ohio Life Insurance & Trust Company, vs. Merchants' Insurance & T. Company*, 11 *Humph. (Tenn.)* 1; *The Chester Glass Co. vs. Dewey*, 16 *Mass.*, 94; *The Steam. Nav. Co. vs. Meed*, 17 *Barb.*, 378; *The Silver Lake Bank vs. North*, 4 *John. Ch.*, 371; *Moss vs. McCullough*, 7 *Barb.*, 292, reaffirming the doctrine of *Moss vs. The Rossie Lead Mining Co.*, above cited. See also the able and elaborate opinion of Comstock, C. J., in the recent case of *Bissell vs. The Mich. South. and North. Ind. R. R. Cos.*, 22 *N. Y.*, p. 258. See also opinion of Selden, J., in same case, pages 289, 290, and 304, who, although he dissents from some of the positions of Comstock, C. J., yet holds distinctly the doctrine above contended for. 29 *Vt.*, 93.

We have thus far considered the case as though the suit was brought by the payees on the notes. But there are other reasons why the Regents cannot avail themselves of any want of power in the making of these notes as a defence, if any such exists, growing out of their negotiation ; and,—

VI.—The Respondents are in the position of *bona fide* endorsers for full value without notice. See *Byles on Bills*, p. 130, (*marginal*); *Chitty on Bills*, p. 220; *Story on Prom. Notes*, sec. 191; *Smith Mercantile Law*, p. 342; *Thompson vs. Shepherd*, 12 *Met.*, 311; *Fisher vs. Leland*, 4 *Cush.*, 457.

VII.—If the Regents had no power to make notes for the purpose for which these were given, yet they had power to make notes for some purposes. See the authorities cited to the first and second points.

VIII.—If the Regents were authorized to give notes for any purpose, a note given by them is valid in the hands of a *bona fide* indorsee, though the corporation might not have had the power to make the particular note. *Angell & Ames on Cor.*, sec. 268; *Story on Prom. Notes*, sec. 192; *P. G. & C. F. Stovey vs. The Am. Life Ins. Co.*, 11 *Paige Ch.*, 635; *Safford vs. Wykoff*, 4 *Hill*, *p.* 445, *Bissell vs. Mich. S. & N. Ind. R. R. Cos.*, 22 *N. Y.*, *p.* 289; *McIntire vs. Preston*, 5 *Gilman*, *Ill.* 48, *before cited.*

IX.—The point made by the Appellants that Steele was not authorized to sign the notes, falls before the special finding of the jury "that Franklin Steele and Isaac Atwater were authorized by the said Board of Regents to execute said notes in their behalf." See *case, fol.* 93.

It appears from the evidence that Steele was the acting President from the organization of the Board up to and including the time of the execution of these notes. (See *case, folios* 63-4-5.) It was simply a question of Agency, and the jury have found that Mr. Steele was the man authorized to sign the notes; *i. e.*, was the man meant by "President." Furthermore it appears conclusively from the evidence that the Board ratified the act of the execution of these notes by Steele and Atwater. See *folio* 65.

X.—If the Court should hold that the Respondents are not entitled to recover on the notes themselves, then they insist that they are entitled on the original consideration to the amount of the notes with seven per cent. per annum interest from their date—the complaint being framed with that view, and the evidence showing conclusively the amounts mentioned in the notes were agreed by the parties to be due. And in that event Respondents offer to remit the excess of interest over 7 per cent. per annum included in the verdict.

But we apprehend the Court will not come to this conclusion, because if the Regents had power to contract the debt, we think it will be held that they had the power to give the notes for it, and if they are estopped from denying that they had powers to contract the debt for either of the reasons

above assigned, they are also estopped from denying they had power to give the notes.

GORDON E. COLE, Attorney General.

BOND & CLARK, Counsel for Respondents.

*By the Court*—FLANDRAU, J.—The Regents of the University of Minnesota are made a corporation by *chap.* 23 *of the Comp. Stats., p.* 350. Section one establishes the University. Section two provides a fund for the support of the same from the proceeds of the lands that may be granted by the United States to the Territory for that purpose. Section three declares the object of the University to be purely educational. Section four vests the government of the same in a Board of Regents, and together with section five, provides the manner of their election. Section seven makes them a body corporate, with the right, as such, of suing and being sued, contracting and being contracted with, and of making, using and altering a common seal. Section eight authorizes the Regents to appoint a secretary, treasurer and librarian, and defines the duties of the first two officers. Section nine confers upon the Regents certain powers, among which are to elect a Chancellor, who shall be *ex officio* President of the Board of Regents, and in his absence, authorizes them to appoint one of their own number President *pro tem.* Section thirteen locates the University at St. Anthony and authorizes the selection of a site for the same, and the erection of the buildings as soon as funds may be provided for that purpose. Section fifteen authorizes the Regents to expend such portions of the fund which, by the provisions of said chapter 23 may come under their control, as they may deem expedient, for the erection of buildings, &c. These are the only portions of the chapter that it is necessary to refer to in this case. The Regents were confined in all their expenditures, to the particular fund referred to, and provided by that chapter, and persons dealing with them would be held chargeable with knowledge of their rights and powers. In 1856, they were, by act of the Legislature, (*Comp. Stat.* 352), empowered to issue the Bonds of

the University to the amount of $15,000, secured by mortgage on the lands referred to in chapter 23 above mentioned, for the purpose of liquidating a debt incurred in the purchase of the site authorized by section 13 of said chapter, to the amount of $5,000, and the balance, of $10,000, to be expended in the erection of the buildings also provided for in section 13. By a subsequent act, passed March 8, 1858, (*Comp: Stat.* 353), the Regents were empowered to raise by the same means the sum of $40,000, about the disbursement of which nothing is said.

We think these three acts must be construed together, and the two latter be understood as providing the fund spoken of in the first. They, however, depart to a certain extent, from the original design of applying the fund. The first act declares that the proceeds of all lands that may hereafter be granted by the United States to the Territory, for the support of a University, shall be and remain a perpetual fund to be called the " University Fund," the interest of which shall be appropriated to the support of a University. It was the design of this act to retain all the proceeds that might arise from the sale or mortgage of the University lands, as a principal fund, which was not to be encroached upon, but was to be invested to produce a revenue for the support of the University. The interest alone was to be expended. The act of 1856, however, authorizes $15,000 to be raised upon bonds, and mortgage of these lands, and makes a specific appropriation of the whole sum to two objects—$5,000 to pay a debt, for the site, and $10,000 to be expended in the erection of the buildings. The act of 1858 raises $40,000 by bond and mortgage of the same lands, but makes no appropriation of it for any purpose. It might be said that this $40,000 was the first proceeds of the lands contemplated by section 2 of the charter of the University, or chapter 23 above spoken of, and .t once became a " perpetual fund," the interest of which alone was subject to the disposal of the Board of Regents ; but we are of opinion that the two latter acts must receive the same interpretation, and that of 1858 be understood to have been passed to supply a deficiency growing out of the inadequacy of the sum raised by the act of 1856, and to carry

out the purpose of that act, which was to erect a University building. Cotemporaneous history and a fair comparison of the two acts, justify this conclusion. Had the act of 1858 intended to devote the money raised under its provisions to the " perpetual fund " spoken of in the charter, some provision would have been made for its investment by the Regents, in order that a revenue in the way of interest might be raised.

The conclusions we arrive at from this analysis of the several acts that control the subject, are as follows :

1st. The Board of Regents are a public corporation, for the purpose, among other things, of erecting a University building, and for that purpose, with the restrictions hereafter mentioned, possess all the powers necessary to the attainment of that end. They could make all necessary contracts, and give written evidences to creditors, of debts incurred in and about the work, payable at a future day, but could not execute a negotiable promissory note in the commercial sense of that term, because they were restricted in their expenditures to the particular fund provided for them by the Legislature, and had no power to contract debts upon the credit of any other, and negotiable paper must be payable absolutely.

2d. That their powers were known to all persons dealing with them.

3d. That an action may be maintained against them upon any contract which they had power to enter into, concerning the erection of the University buildings, but that a judgment recovered upon such contracts, would bind only the fund upon the faith of which the credit was originally given.

4th. That the title to the lands reserved by Congress for the " use and support of a State University," is in the State, and not in the corporation, and all property acquired by the Regents, real or personal, with the fund placed at their disposal, is the property of the State, the corporation being merely a trustee or agent, with specified and limited powers, to use it in a particular manner for a given end.

In regard to the manner in which the notes are executed, we think that the power granted by section 9 of the charter, to the Board of Regents, to elect one of their own number

Regents of the University of the State of Minnesota v. Hart et al.

President *pro tem.*, in the absence of the Chancellor, confers upon the President *pro tem.*, when so elected, the same powers that are vested in the permanent President, and any business that could be transacted by one, might be done by the other. The Board by a resolution, passed at a meeting over which Mr. Steele presided as President, authorized the President and Secretary to sign the notes, in pursuance of which they were issued by Mr. Steele and the Secretary. The counsel insists that the resolution referred to the regular President, and not to Mr. Steele; but from the whole evidence we take a different view. The Chancellor seldom attended the business meetings, and Mr. Steele generally did, and always acted as temporary chairman; we think the resolution referred to him.

We have examined the authorities cited by the Attorney General, and we think they establish the rule, that a corporation which is confined in its expenditures to a particular fund, may not create a debt or borrow money beyond such fund, without express authority. To this rule we assent, but we do not think the Regents did either by the issuance of these notes. They merely postponed the payment of a demand against the Board, which might have been immediately paid out of the fund in their hands for that purpose. It was drawing on the fund at a future day.

The Plaintiffs are entitled, under the pleadings and evidence, to judgment on the notes, but such judgment can only be executed on the fund provided by the Legislature for the erection of the building.

The order denying the new trial is affirmed.

Note.—Justice Atwater having acted as Secretary of the University in making the notes in question in this suit, took no part in the decision.